Filed 7/17/26  P. v. Rowe CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GERALD WILLIAM ROWE,<br><br>        Defendant and Appellant. | A170674<br><br>(San Francisco City & County Super. Ct. Nos. SCN 232883, CT# 19002899) |

A jury convicted defendant Gerald Rowe of first degree murder and conspiracy to commit murder and found true torture-murder and poison-murder special circumstances based on his participation in the 2019 killing of George Randall-Saldivar.  Rowe was sentenced to life in prison without the possibility of parole.

On appeal, Rowe claims the trial court erred in (1) instructing the jury on the definition of "poison"; (2) declining to instruct the jury on involuntary manslaughter; and (3) imposing a concurrent sentence for the conspiracy conviction.  We reject the claims of instructional error based on a lack of prejudice, and we accept the Attorney General's concession that sentencing error occurred.  Thus, we order the term on the conspiracy conviction stayed but otherwise affirm the judgment.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

We abbreviate our factual discussion, because our conclusion that neither of the instructional errors Rowe raises was prejudicial turns not on the evidence as a whole, but primarily on the jury's other findings.

At the time he died in February 2019, Randall-Saldivar was 23 years old and addicted to methamphetamine. In the hours leading up to his murder, he used drugs and engaged in consensual sexual activity with Rowe and Rowe's acquaintance, Angel Anderson, in the small hotel room where Rowe lived. Rowe and Anderson then tied Randall-Saldivar's hands behind his back, put his neck in a noose attached to the ceiling, and kept him bound for several hours; injected something into his arm with a syringe, after which he had a seizure; and zipped him into a suitcase, later disposing of his body in the San Francisco Bay. Silent, continuous video footage of the activity in the hotel room before, during, and after the murder was recorded by Rowe's digital video recorder system and played for the jury.

Randall-Saldivar's body was found floating in the water near Pier 39 on February 18, 2019. Initially, no foul play was suspected. But a few days later, Anderson was arrested in Sacramento County and confessed to a murder in San Francisco. Based on Anderson's statements, the San Francisco police obtained a warrant and searched Rowe's Market Street hotel room.[1] In addition to methamphetamine and several weapons, the police found video equipment and recordings in the hotel room. The video footage captured events between when Randall-Saldivar first arrived at the hotel

---

[1] Anderson's case was severed from Rowe's, and her statements to law enforcement were excluded from his trial. Anderson ultimately entered a plea to first degree murder and was sentenced to 25 years to life in prison.

room on the afternoon of February 3 and when Anderson and Rowe left the room with a suitcase containing Randall-Saldivar's body on the morning of February 5.

Throughout the first several hours that Randall-Saldivar was in the hotel room, he, Rowe, and Anderson repeatedly smoked methamphetamine and engaged in sexual activity. Around 1:30 a.m. on February 4, Rowe and Anderson suspended a rope with a noose already tied in it from a pulley mechanism on the ceiling. Anderson placed the noose around Randall-Saldivar's neck and bound his wrists behind his back. Over the next few hours, Randall-Saldivar remained in the noose while Anderson and Rowe occasionally hit him and pulled on the rope. At one point, Anderson put a cloth bag over Randall-Saldivar's head, hooding him, and she and Rowe engaged in sexual activity with each other while Randall-Saldivar remained bound.

Around 4:45 a.m., Rowe left the room alone and returned about 10 minutes later with a small plastic bag of narcotics. Rowe flicked the bag and then handed it to Anderson. She poured white powder from the bag onto a spoon and loaded the spoon's contents into a syringe. Anderson tied off Randall-Saldivar's upper right arm with a cord, and Rowe held the same arm while Anderson appeared to inject the syringe into the back of it.

After the injection was complete, Rowe immediately removed the noose from Randall-Saldivar's neck. Within a couple minutes of the injection, Randall-Saldivar began convulsing. He made some movements over the next few minutes before Anderson removed the bag from his head and retrieved a suitcase.

Randall-Saldivar took two deep breaths at about 5:20 a.m. A few minutes later, Anderson moved the suitcase to the ground, lifted Randall-

3

Saldivar, and dropped him toward it. It was unclear whether he was still alive at this point. Anderson untied his wrists, and she and Rowe placed his body in the suitcase. Rowe later placed a large garbage bag over the suitcase.

Anderson and Rowe engaged in various activities for the rest of the day, including tidying the hotel room and taking showers. Around 2:40 a.m. on February 5, about 21 hours after killing Randall-Saldivar, Anderson and Rowe left the hotel room with the suitcase. Surveillance cameras recorded the two walk with the suitcase to the Embarcadero. The footage stopped near an area with pedestrian access to the Bay. Anderson and Rowe were recorded returning to the room in different clothing and without the suitcase about an hour later.

A primary contested issue at trial was Randall-Saldivar's cause of death, with forensic testing complicated by the fact his body was found in the water weeks after his death. Tissue from Randall-Saldivar's right arm tested positive for fentanyl and methamphetamine, and his blood contained those substances as well as cocaine. The prosecution presented expert evidence tending to suggest that Randall-Saldivar died from an overdose of fentanyl or combination of drugs, with asphyxia from being placed in the suitcase as a "significant contributor." The defense presented expert evidence calling into question the reliability of the forensic testing performed and casting doubt on whether Randall-Saldivar died from a fentanyl overdose and/or asphyxia, as opposed to effects of his own drug use or a prior health condition.

The operative information, which was filed during trial, charged Rowe with one count of murder and one count of conspiracy to commit murder.[2]

_____

[2] Rowe was charged with murder under Penal Code section 187, subdivision (a), and conspiracy to commit murder under that provision and Penal Code section 182, subdivision (a)(1). All further statutory references are to the Penal Code.

4

For the murder, two special circumstances were alleged: the murder was intentional and involved the infliction of torture, and Rowe intentionally killed Randall-Saldivar by the administration of poison.[3]

The jury found Rowe guilty of first degree murder and conspiracy to commit murder and found true the torture-murder and poison-murder special circumstances. In April 2024, the trial court sentenced him to life without the possibility of parole for the murder and imposed a concurrent term of 25 years to life for the conspiracy to commit murder.

## II.
### DISCUSSION

### A.    *Rowe's Challenge to the Instructions on Poison Murder Fails.*

Rowe claims the trial court prejudicially erred by instructing the jury on the definition of "poison" in relation to murder by poison, one of the theories of first degree murder presented to the jury, and the poison-murder special circumstance. The Attorney General concedes that the instructions were incorrect but argues that the error was harmless. We agree with the Attorney General.

### 1.    Additional facts

Jury instructions were given on three theories of first degree murder: willful, deliberate, and premeditated murder; murder by torture; and murder by poison. As to unanimity, the jurors were instructed, "You may not find the defendant guilty of first-degree murder unless all of you agree that the People

---

[3] The special circumstances were alleged under section 190.2, subdivision (a)(18) (torture) and (19) (poison). Aggravating factors were alleged under California Rules of Court, rule 4.421, but Rowe waived a jury trial on them, and it was ultimately unnecessary for the trial court to rule on them given the verdicts.

5

have proved that the defendant committed murder.  But all of you do not need to agree on the same theory."

The trial court instructed the jury on murder by poison under a modified version of CALCRIM No. 521, part H, and on the poison-murder special circumstance under a modified version of CALCRIM No. 734.  The first instruction provided that Rowe was guilty of first degree murder if (1) "[h]e deliberately gave George Randall-Saldivar poison" and (2) "[w]hen giving the poison, [he] intended to kill George Randall-Saldivar or to inflict injury likely to cause George Randall-Saldivar's death."  The second instruction provided that the special circumstance was true if (1) "[t]he defendant intended to kill George Randall[-]Saldivar" and (2) "[t]he defendant killed George Randall[-]Saldivar by the administration of poison."  Both instructions then defined "poison" as "a substance, applied externally to the body or introduced into the body, that can kill by its own inherent qualities. [¶] *Fentanyl is a poison.* [¶] *Methamphetamine is a poison.* [¶] *Cocaine is a poison.*"  (Italics added.)

On appeal, Rowe challenges the italicized language, which was added to CALCRIM Nos. 521 and 734 at the prosecutor's request.  When the prosecutor proposed that language, Rowe's trial counsel responded, "I don't disagree with those three things.  I just don't know if there was testimony that cocaine was a poison, but maybe I'm missing something."  After the prosecutor affirmed that she had presented evidence that cocaine was a poison, Rowe's counsel asked the trial court to add language to the instruction stating that "any substance including water . . . can be a poison.  It's the amount that constitutes whether it's a poison or not."  The court declined to do so, indicating it was a matter for argument.

6

### 2. General legal standards

"All murder that is perpetrated by means of . . . poison" constitutes first degree murder. (§ 189, subd. (a).) To obtain a conviction, "the prosecution must show that the defendant deliberately gave the victim poison with the intent to kill the victim or inflict injury likely to cause the victim's death." (*People v. Brown* (2023) 14 Cal.5th 453, 471 (*Brown*), fn. omitted.) The poison-murder special circumstance has similar proof requirements, except that the defendant must have intended to kill, not just inflict deadly injury. (*Id.* at p. 470; *People v. Catlin* (2001) 26 Cal.4th 81, 158.)

"Poison" is not statutorily defined, but CALCRIM Nos. 521 and 734's definition of it as "a substance . . . that can kill by its own inherent qualities" is consistent with our state Supreme Court's decisions. (See *Brown*, *supra*, 14 Cal.5th at p. 466 [quoting CALCRIM No. 521's definition without comment]; *People v. Van Deleer* (1878) 53 Cal. 147, 149 [poison "must be capable of destroying life"].) *Brown* expounded, " '[T]he "dose makes the poison" and . . . all chemical agents, including water, are harmful if consumed in large quantities, while even the most toxic substances are harmless in minute quantities.' " (*Brown*, at p. 466.)

"[I]nstructional error relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violates the defendant's rights under both the United States and California Constitutions." (*People v. Flood* (1998) 18 Cal.4th 470, 479–480.) Such a violation may occur when a trial court effectively instructs the jury that evidence meets a particular element of a crime (or special circumstance) as a matter of law. (See, e.g., *id.* at pp. 476–477, 482 [instruction that police officers qualified as "peace officers"]; *People v. Figueroa* (1986) 41 Cal.3d 714, 723, 734 [instruction that promissory note constituted "security"].) Thus,

" 'no matter how conclusive the evidence, a trial court cannot directly inform the jury that an element of the crime charged has been established. Absent a stipulation by the defendant that an element is established or is admitted, the . . . court must submit that question to the jury.' " (*People v. Yarbrough* (2008) 169 Cal.App.4th 303, 315.) We review claims of instructional error de novo. (*People v. Frazier* (2024) 16 Cal.5th 814, 839.)

### 3. The instructional error was harmless as to both the murder conviction and the special-circumstance finding.

The parties agree that the challenged instructions' statement that fentanyl, methamphetamine, and cocaine all constitute "poison" violated Rowe's constitutional rights by removing an element of the crime and special circumstance from the jury's consideration. They also agree that the applicable standard for assessing prejudice is whether the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18.

Initially, we question whether Rowe preserved this claim. Not only did his trial counsel affirmatively acquiesce to the challenged instructional language, counsel sought a further pinpoint instruction that *any* substance can be a poison. Nonetheless, we will address Rowe's claim on the merits because the Attorney General takes the position that Rowe did not expressly stipulate that fentanyl, methamphetamine, and cocaine are all poisons (see *People v. Yarbrough, supra*, 169 Cal.App.4th at p. 315), and the instructional error affected Rowe's substantial rights (see § 1259).

Although Rowe claims that both CALCRIM Nos. 521 and 734 were erroneous, his prejudice discussion focuses on the poison-murder theory, and he requests that we reverse the murder conviction without separately urging reversal of the poison-murder special circumstance. But we use a somewhat different analysis as to each finding, given that two other valid theories of

8

first degree murder were presented to the jury but the poison-murder special circumstance stands on its own.

We begin by concluding that the instructional error was undoubtedly harmless as to the murder conviction.  Where, as here, "a jury is instructed on alternate theories of liability, [some] legally valid and [another] legally invalid," we may find the error harmless beyond a reasonable doubt by " 'examin[ing] what the jury necessarily did find and ask[ing] whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well.' [Citation.]  In other words, if ' "[n]o reasonable jury" ' would have found in favor of the defendant on the missing fact, given the jury's actual verdict and the state of the evidence, the error may be found harmless beyond a reasonable doubt." (*In re Lopez* (2023) 14 Cal.5th 562, 580.)

We agree with the Attorney General that Rowe's conviction of conspiracy to commit murder establishes that the jury necessarily found the murder was willful, deliberate, and premeditated, which is sufficient to uphold the first degree murder verdict.  "[W]here two or more persons conspire to commit murder—i.e., intend to agree or conspire, further intend to commit the target offense of murder, and perform one or more overt acts in furtherance of the planned murder—each has acted with a state of mind 'functionally indistinguishable from the mental state of premeditating the target offense of murder.' [Citation.]  The mental state required for conviction of *conspiracy* to commit murder necessarily establishes premeditation and deliberation of the target offense of murder—hence all murder conspiracies are conspiracies to commit first degree murder." (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232.)  Here, by returning the murder conviction the jury necessarily "agree[d] that the People . . . proved

9

that [Rowe] committed murder," and even if some of the jurors relied on the poison-murder theory, the jury's conspiracy verdict established that all the jurors also found that the murder was willful, deliberate, and premeditated. Thus, Rowe's challenge to his murder conviction fails.

As for the special circumstance, we conclude that the instructional error was harmless because no rational juror could have harbored a reasonable doubt about whether fentanyl, methamphetamine, or cocaine met the definition of "poison." (See *People v. Lee* (1987) 43 Cal.3d 666, 679.) Each substance, like water or any other chemical agent, is a "substance . . . that can kill by its own inherent qualities," and no evidence to the contrary was presented. (See *Brown*, *supra*, 14 Cal.5th at p. 466.) Although we agree with Rowe that it was hotly contested whether an injection of one or more of these substances *caused* Randall-Saldivar's death, CALCRIM No. 734 required a finding that Rowe "killed . . . Randall[-]Saldivar *by* the administration of poison," i.e., not only that "poison" was administered but also that it caused the death. (Italics added.) In other words, the language defining each of the three substances as "poison" did not remove a contested issue from the jury's consideration, as it conveyed that each substance was inherently capable of killing but not that each was administered to Randall-Saldivar at a dose that did in fact cause his death. As a result, we conclude beyond a reasonable doubt that the jury would have found the poison-murder special circumstance true even if it had not been instructed that fentanyl, methamphetamine, and cocaine each qualified as "poison."

### B. *Any Error in Failing to Instruct the Jury on Involuntary Manslaughter Was Harmless.*

Rowe next contends that the trial court erred by refusing to instruct the jury on involuntary manslaughter as a lesser included offense of murder. We conclude that any error was harmless.

10

The defense asked the trial court to give CALCRIM No. 580 on involuntary manslaughter. Rowe's trial counsel argued that there was substantial evidence that Rowe did not harbor malice and the killing was criminally negligent only. The prosecutor responded that Rowe's defense was voluntary intoxication, which did not apply to involuntary manslaughter unless it rose "to the level of unconsciousness." Although the trial court did instruct on voluntary intoxication as it affected Rowe's ability to form certain mind states, the court agreed with the prosecutor that there was insufficient evidence to justify CALCRIM No. 580.

Involuntary manslaughter is "the unlawful killing of a human being without malice" during "the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b); see *People v. Brothers* (2015) 236 Cal.App.4th 24, 31 [statute also encompasses "unintentional killing in the course of a noninherently dangerous felony"].) If a person becomes " 'unconscious through voluntary intoxication and kills in that state, the killing is attributed to [the person's] negligence in self-intoxicating to that point, and is treated as involuntary manslaughter.' " (*People v. Nieves* (2021) 11 Cal.5th 404, 463.) Otherwise, "[e]vidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).)

Involuntary manslaughter is a lesser included offense of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) "The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the

11

defendant committed the lesser, uncharged offense, but not the greater." (*People v. Brothers*, *supra*, 236 Cal.App.4th at p. 29.) We review de novo the failure to instruct the jury on a lesser included offense, "considering the evidence in the light most favorable to the defendant." (*Id.* at p. 30.)

We need not address whether there was substantial evidence to support an instruction on involuntary manslaughter, because the error was harmless under any standard. (See *People v. Schuller* (2023) 15 Cal.5th 237, 254 [failure to instruct on lesser included offense is federal constitutional error if it amounts to incomplete instruction on element of greater crime]; *People v. Temple* (2025) 110 Cal.App.5th 1281, 1294 [failure to instruct on involuntary manslaughter as lesser included offense of murder violates only state law].) " '[A] trial court's failure to instruct on a lesser included offense is not prejudicial if, as here, the jury necessarily resolved the factual question adversely to the defendant under other instructions.' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1155.) As discussed above, the jury necessarily found that Rowe committed premeditated murder in convicting him of conspiracy to commit murder. It was also properly instructed on and rejected the lesser included offense of second degree murder based on express or implied malice, both of which require a more culpable mind state than does involuntary manslaughter. (*People v. Rogers* (2006) 39 Cal.4th 826, 884.) Thus, we conclude beyond a reasonable doubt that Rowe would not have obtained a more favorable result had an instruction on involuntary manslaughter been given, and there is no reasonable probability that the instruction's omission affected the verdict. (See *ibid.*; *Barnett*, at p. 1156.)

C.      *The Sentence on the Conspiracy Conviction Must Be Stayed.*

12

Finally, Rowe claims the trial court erred by not staying the term for conspiracy to commit murder.  The Attorney General agrees, and we accept the concession and order the term stayed.

Section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of [the] law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)  The statute "has long been interpreted to preclude multiple punishments not only for a single act that violates more than one statute, but for an indivisible course of conduct."  (*People v. Mejia* (2017) 9 Cal.App.5th 1036, 1042.)  In particular, a defendant may not be punished for both murder and conspiracy to commit murder.  (*People v. Hernandez* (2003) 30 Cal.4th 835, 866; *People v. Vu* (2006) 143 Cal.App.4th 1009, 1032–1033.)  Thus, as the parties agree, the sentence on the conspiracy count must be stayed.  (See *Vu*, at pp. 1032–1033; see also *People v. Alford* (2010) 180 Cal.App.4th 1463, 1472.)

## III.
### DISPOSITION

The judgment is modified to stay the term of 25 years to life on count 2, conspiracy to commit murder.  As so modified, the judgment is affirmed.

_____

Humes, P. J.


WE CONCUR:



_____

Langhorne Wilson, J.



_____

Smiley, J.



*People v. Rowe*  A170674

14